UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
Norbert Mehl and Batsheva Mehl,

                       Plaintiffs,

         -against-

LSF9 MASTER PARTICIPATION TRUST,
FAY SERVICING, LLC, AUCTION.COM, INC.,
FAHMIDA ZAMAN, JACOB R. SELECHNIK,
TG APTS LLC, 153 MLS, LLC, and all unknown
persons or entities, claiming any legal or equitable right,
title, estate, lien or interest in the property subject to this
action adverse to Plaintiffs' title, or any
cloud upon Plaintiffs' title thereto; and
Does 1 through 10, inclusive,

                       Defendants
------------------------------------------------------------------x

Case No. _____CV_____

**COMPLAINT**
**JURY TRIAL DEMANDED**

# I. INTRODUCTION

1.     Plaintiffs **Norbert Mehl** and **Batsheva Mehl** (together, the "Mehls" or "Plaintiffs"), residents of Westchester County, seek judicial relief from the consequences of a foreclosure auction and conveyance tainted by procedural irregularities, deceptive servicing conduct, and coordinated anticompetitive behavior among the Defendants, and therefore bring this action for:

    A.  **Quiet Title,** pursuant to **N.Y. Real Prop. Actions & Proc. Law § 1503**

    B.  **Violations of the Sherman Act (15 U.S.C. § 1)**

    C.  **Violations of the Donnelly Act (N.Y. Gen. Bus. Law § 340)**

    D.  **Violations of the FDCPA (15 U.S.C. § 1692 et seq.)**

    E.  **Violations of the TILA (15 U.S.C. § 1601 et seq.)**

    F.  **Violations of the RESPA (12 U.S.C. § 2601 et seq.)**

G. **Deceptive Practices** under **N.Y. Gen. Bus. Law § 349**

H. **Declaratory Judgment** pursuant to **28 U.S.C. § 2201**

2.      Plaintiffs allege upon information and belief, that these claims stem from a tainted foreclosure auction sale of Plaintiffs' longtime residence located at 153 Morris Lane South, Scarsdale, NY 10583 (the "Property"), held at the lobby of the Westchester County Courthouse on May 22, 2025 and a resulting conveyance executed on July 10, 2025, both alleged to be procedurally defective and driven by a collusive scheme orchestrated by Defendants.

## II. JURISDICTION AND VENUE

3.      Jurisdiction exists under **28 U.S.C. §§ 1331** and **1367**, as Plaintiffs allege violations of federal statutes including the Sherman Act, FDCPA, TILA, and RESPA, and invoke state-law claims arising from the same nucleus of facts.

4.      Venue is proper in SDNY under **28 U.S.C. § 1391(b)**, as the property, events, and parties are centered in Westchester County, New York.

## III. THE PARTIES

**Plaintiffs:**

5.      Norbert Mehl: A Licensed Corporate Real Estate Broker residing at the Property, situated at 153 Morris Lane South, Scarsdale, NY 10583.

6.      Batsheva Mehl: A Co-owner and longtime resident of the Property.

**Defendants:**

7.      LSF9 Master Participation Trust ("LSF9"): A Delaware trust, whose trustee and registered agent is U.S. Bank Trust N.A. (the "Trustee" or "Mortgage Holder"), located at 1011 Centre Road Suite 203, Wilmington, DE 19805.

8.      Fay Servicing, LLC ("Fay"): A Delaware LLC mortgage servicer with over 1,000 distressed properties under management, and a principal office at 10100 N. Dale Mabry Hwy, Suite 200, Tampa, FL 33618.

9.      Auction.com, Inc. ("Auction.com"): A California-based nationwide foreclosure auctioneer and real estate broker headquartered at One Mauchly, Irvine, California, 92618, with a New York brokerage license.

10.     Fahmida Zaman ("Zaman"): A natural person and NYS-licensed real estate broker specializing in foreclosure transactions, located at 3424 Irwin Avenue, Bronx, NY 10463.

11.     Jacob R. Selechnik ("Selechnik"): A natural person with a principal place of business at 5600A Broadway, Bronx, NY 10463-5500, a longtime NY-based investor, and NYS-licensed real estate broker linked to over 100 distressed property acquisitions over the past six decades.

12.     TG APTS LLC ("TG APPTS"): A New York-based LLC organized under the laws of the State of New York (DOS ID: 4860577), whose sole member is co-Defendant Jacob Selechnik.[1]

13.     153 MLS, LLC ("153 MLS"): A New York-based LLC organized under the laws of the State of New York on December 8, 2015, with an address for service of process at 333 Earle Ovington Blvd., Suite 901, Uniondale, NY 11553 (DOS ID: 7634991). [2]

---

[1] According to the New York State, Department of State ("DOS"), Division of Corporations, the TG APTS agent for service of process is listed (as of July 8, 2025) as GEORGE TABOR, with an address at 185 W 231st St., Bronx, NY 10463, which is the actual address of THE UPS STORE #7389. According to the New York State Unified Court System, Attorney Detail Report, George Tabor is reported as *deceased* (Registration Number: 1010131).

[2] The 153 MLS agent for service of process is attorney Robert J. Chanis, a former Partner at the law firm Troutman Sanders LLP n/k/a Troutman Pepper Locke, who serves as legal counsel for Fay, LSF9 and the plaintiff in the underlying foreclosure action in Westchester Supreme Court, Index No. 68529/2016 and related NYS Supreme Court, Second Department, Appellate Division in the pending matter under Index No. 2023-04192, this raising questions of potential conflict of interest. *See, e.g.,* ***About That $75 Million …*** | Courthouse News Service, September 12, 2012 (HSBC Bank sued Troutman Sanders and Robert Chanis, claiming that its lawyers at Troutman Sanders turned a blind eye to a political fund raiser who defrauded the bank of nearly $75 million. "This action for legal malpractice arises

14.    Defendants named herein as "All Unknown Persons or Entities, Claiming Any Legal Or Equitable Right, Title, Estate, Lien Or Interest In The Property Subject To This Action Adverse To Plaintiffs' Title, Or Any Cloud Upon Plaintiffs' Title Thereto" (the "Unknown Defendants") (collectively with the previously named Defendants, hereafter referred to as the "Defendants") are unknown to Plaintiffs. Plaintiffs are informed and believe, and on that basis allege, that the Unknown Defendants, and each of them, claim some right, title, estate, lien, or interest in the real property and real property interests that are adverse to Plaintiffs' Property interests at issue in this action.

15.    Plaintiffs do not know the true names and capacities of the defendants sued as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. Upon information and belief, Defendants may have granted interests in the Property and/or soon will grant such ownership interests. Plaintiffs do not currently know the true names and capacities of those who may claim an ownership interest in the Property, but Plaintiffs will amend the complaint to add the true names and capacities of these defendants when they are ascertained.

## IV. FACTUAL BACKGROUND

### A. Ownership and Foreclosure Initiation

16.    Plaintiffs owned the Property continuously from **June 15, 1999, through July 10, 2025.**

17.    Plaintiffs and their family have resided in the Property from 1999 to the present and are currently in possession of the Property.

---

out of defendants' negligent representation of HSBC in a $100 million securities-backed loan transaction (the 'HSBC Loan'), and their independent breach of the express terms of the agreements governing the parties' attorney/client relationship," the complaint states.)

18.     On December 7, 2016, LSF9 through its Trustee commenced the underlying Foreclosure Action against Plaintiffs by filing a Summons and Complaint to foreclose on a promissory note and mortgage dated August 24, 2007 issued by now-defunct Washington Mutual Bank ("WaMu"), erroneously addressed at *153 Morris Lane, New Rochelle, NY 10801*. (NYSCEF Index No. 68529/2016 ["NYSCEF"] Doc. Nos. 1-3)

## B. Judicial Sale and Referee's Role

19.     On **May 1, 2023**, after a lengthy litigation, the State Court entered a Judgment of Foreclosure and Sale (the "JFS") (NYSCEF Doc. No. 605).

## C. Role and Conduct of Auction.com

20.     On **April 1, 2025**, Defendant Fay filed or caused to be filed a Notice of Sale scheduled for **May 22, 2025** referring all sale information to www.Auction.com or by calling Auction.com's telephone number at (800) 280-2832 (NYSCEF Doc. No. 719). See copy attached as <u>Exhibit 1</u>.

21.     The sale was conducted by the court-appointed referee Stephen P. Gold, Esq. (the "Referee") and involved Defendant Auction.com, a nationwide auctioneer and New York State licensed real estate brokerage firm who was visibly and functionally involved in the Foreclosure Sale Auction without express authority provided by the Judgment of Foreclosure and Sale.

22.     The Referee lacked judicial authorization to delegate any component of the judicial auction sale to Auction.com or allow its agents to register bidders or appear alongside him.

23.     Where, as here, the Judgment of Foreclosure and Sale lacks authorization to engage a third-party auctioneer or broker, any such involvement is ultra vires and legally impermissible.

24.     Such involvement and delegation of operational responsibility, in addition to numerous other irregularities as set forth below, constitute material deviation from the procedures

mandated under New York law and justifies vacatur of the sale to preserve judicial integrity and procedural regularity.

### D. Bid Irregularities and Procedural Deviations

25.     Auction.com, a real estate auction site specializing in the sale of residential foreclosure and bank-owned (REO) properties, is frequently hired by foreclosing lenders or loan servicers to market these distressed properties.

26.     Auction.com's frequently asked questions (FAQ) state as follows:

> The foreclosure process starts when a homeowner stops paying their mortgage. The lender sends the homeowner a notice, giving them a period of time to pay, or the property goes to auction. The homeowner can take steps to either postpone or cancel the auction.

> At the auction, the bank won't bid more than the credit bid. The purchaser at the auction is essentially paying off the mortgage and is responsible for any additional liens attached to the property. If no one bids above the credit bid, the property goes back to the bank. And, it becomes a real-estate owned (REO) property for sale.

27.     Pursuant to its New York State Disclosure Form, Auction.com, the auctioneer was appointed to act as the "real estate broker," Seller's Agent", and "in the interest of the Seller" in connection with the Foreclosure Sale Auction, thus creating from the outset a conflict of interest, lack of impartiality and a fair competitive process.[3]

28.     Upon information and belief, the Referee's violations of the **Auction Rules for the 9th Judicial District** (the **"Auction Rules"**) during the Foreclosure Sale Auction of the subject Property include, but are not limited to the following:

> a.  **Referee's Report of Sale Inaccurate Disclosure of Highest Sum Bid:** Although the highest sum bid at the Foreclosure Sale Auction on May 22, 2025 was made by Fahmida Zaman on behalf of TG APTS for approximately

---

[3] https://www.auction.com/lp/wp-content/uploads/files/lp/mlhdocs.com/legal/agencydisclosures/ADC/NewYork.pdf

$1,965,000, consisting of $5,000 above the Upset Price, the Referee sold the Property to **153 MLS LLC** for the sum of only $1,960,000, calling that amount **"the highest sum bid"** according to the Report of Sale, which further states: "The winning bidder, **TG APTS LLC**, had assigned the bid to **153 MLS, LLC**." See, Referee's Report of Sale dated July 8, 2025 (NYSCEF Doc. No. 764). Ex. 2.

b. **False and Inconsistent Report of Sale:** On the one hand, Defendant TG APTS was declared the winning bidder by the Referee at the auction on May 22, 2025. Then, Defendant Fahmida Zamin paid the minimum deposit and signed the Terms of Sale on behalf of TG APTS, presumably for a price of $1,965,000. This would not have taken place unless her bid was greater than the Upset Price. Otherwise, LSF and/or Fay or their affiliate would have been the auction winner through a credit bid in the amount of the Upset Price, namely $1,960,000. Such glaring inconsistencies further demonstrate the Defendants' pattern of procedural irregularities, collusive conduct and market manipulation with the Referee's acquiescence.

c. **Failure to Disclose Names and Addresses of Bidders:** In coordination with Auction.com, the names and addresses of the bidders were not stated at the time the bids were made during the Foreclosure Sale Auction or after the auction was concluded.

d. **Failure to Display Terms of Sale:** In coordination with Auction.com, the Referee failed to conspicuously post the Foreclosure Sale Auction Terms of Sale in a designated area of the auction location at least 30 minutes before the auction

commenced. This omission constitutes a material breach of process and impaired bidder parity.

e. **Violation of Statutory Duty:** RPAPL § 1355 explicitly requires the Referee's report of sale to be confirmed by the State Court. Conveyance of the deed without this confirmation, as has been the case here on July 10, 2025, was a direct violation of the Referee's statutory duty and exceeded his authority as an officer of the court.

f. **Breach of Fiduciary Duty:** A referee in a foreclosure action acts in a fiduciary capacity. Their role is to conduct the sale fairly and in accordance with the court's orders and applicable law. Conveying a deed prematurely, without the necessary judicial approval, is a breach of this duty.

g. **Involvement in Alleged Fraud/Conspiracy:** If the referee was aware of or participated in any aspect of the alleged bid-rigging, price-fixing, or other fraudulent schemes as claimed here, this would constitute severe misconduct and an absolute basis for disqualification, removal, and potentially disciplinary or even criminal action. Even if not directly involved, a failure to act on suspicious circumstances surrounding the sale could be grounds.

h. **Lack of Impartiality/Competence:** Proceeding with such a critical step (deed conveyance) without the required Confirmation of Sale demonstrates either a fundamental misunderstanding of their role and the law, or a willful disregard for proper procedure. Either way, it calls into question the Referee's competence and impartiality.

### E. Collusive Conduct and Market Manipulation

29.     As more fully set forth below, between **April 1, 2025**, upon the filing of the Notice of Sale, and **July 10, 2025**, upon the Deed Conveyance to Defendant 153 MLS, the Defendants and others colluded, entered into and engaged in a combination and conspiracy that illegally restrained interstate trade and commerce in violation of Section 1 of the Sherman Act, and the Donnelly Act.

30.     The following aspects of Auction.com's participation fall outside the bounds of permitted support and create sufficient basis to vacate the sale:

      a.  Inclusion of Auction.com as the **"sales contact"** in the publicly disseminated Notice of Sale misleads bidders as to who is conducting the auction.

      b.  Physical presence of Auction.com's representative in the Courthouse lobby **beside the referee** during the auction—handling bidder registration and appearing to facilitate the event—creates the impression of delegated authority.

      c.  These actions **exceed logistical support** and infringe upon the referee's non-delegable judicial role, compromising the formality and neutrality required in judicial sales.

      d.  Pursuant to its **New York State Disclosure Form**, Auction.com, the auctioneer was appointed to act as the "real estate broker," Seller's Agent", and "in the interest of the Seller" in connection with the Foreclosure Sale Auction, thus creating from the outset a conflict of interest, lack of impartiality and a fair competitive process.[4]

---

[4] https://www.auction.com/lp/wp-content/uploads/files/lp/mlhdocs.com/legal/agencydisclosures/ADC/NewYork.pdf

31.     The combination and conspiracy cesspool facilitated by Auction.com at the epicenter of the Foreclosure Sale Auction consisted of a continuing agreement, understanding, and concert of action among the Defendants and co-conspirators, the substantial term of which was to suppress competition by refraining from full competitive bidding, through price fixing, bid rigging, bid suppression, complementary or shill bidding, paybacks, quid-pro-quo, market or deal allocation and other manipulative practices.

32.     Moreover, co-conspirators such as Auction.com, Fahmida Zaman, and Jacob Selechnik, who are licensed New York State real estate brokers and agents acting as Seller's agents, Buyer's Agents, or investors, buyers or sellers with conflicting interests, were acting in concert with each other and the Mortgage Holder, LSF9, and mortgage servicer Fay, eliminating or manipulating price competition, submitting bids at pre-arranged prices, and manipulating the outcome of the Foreclosure Sale Auction of the subject Property held on May 22, 2025 and subsequent closing and Property transfer/s.

33.     In a publicly reported article by *The New York Times*, the Northwest Bronx Community and Clergy Coalition—an organization monitoring landlord conduct since the 1970s—referred to Defendant Selechnik as 'Jake the Snake,' highlighting longstanding community concerns about his management practices. [5]

34.     Upon information and belief, Defendant Selechnik and his family have formed dozens of LLCs over the years for acquiring, managing, and sometimes selling over 100 properties. He has reportedly been buying buildings in New York for nearly 50 years, "amassing an empire that reached a peak of more than 7,000 apartments. Brokers have estimated his net worth at more than half a billion dollars," according to *The New York Times*. As reported by *The Village*

---

[5] See, https://www.nytimes.com/2009/11/19/nyregion/19landlord.html

*Voice*, Defendant Selechnik was allegedly blacklisted by Freddie Mac, necessitating intermediaries to bid on his behalf during foreclosure purchases.[6]

35.    **The Deceptively Hidden Upset Price:** On May 22, 2025, the only bidders who presumably came prepared to the auction held in the lobby of the Westchester County Courthouse, with a minimum down payment deposit greater than 10% of the purportedly undisclosed **$1,960,000 Upset Price**, were Defendants Fahmida Zaman acting in concert with Defendant Jacob Selechnik, via his company Defendant TG APTS LLC, and Defendants Auction.com and Fay, acting in concert with Defendant LSF9.

36.    On May 22, 2025, except for any undisclosed insider shill bidders, the rest of the uninformed bidders were essentially *knocked out* before the auction even started, as their minimum deposits were in effect far below 10% of the Upset Price, given the purposely artificially low price of approximately **$1.477,264.83** indicated in the Notice of Sale, based on a questionable Referee Report computed on or about December 2019, in reliance upon (inflated) loan balance figures provided by Defendants LSF9 and Fay's predecessor, Caliber Home Loans.

37.    Defendants and their co-conspirators agreed not to bid against each other at the public foreclosure auction. As a result, the conspirators purchased the auctioned Property at a price lower than would have resulted from a fully competitive auction, thereby depriving the Property owners, the Mehls, of the full value of the auctioned property.

38.    **False Property Description:** Prior to the May 22, 2025 Foreclosure Sale Auction, the Mortgage Holder, LSF9, Fay, the State Court, and the Referee had been fully aware that the Mehls' correct Property address is at 153 South Morris Lane, Scarsdale, NY 10583, situated in an entirely different zip code 5.5 miles north from the erroneous auction property address situated in

---

[6] See, https://www.villagevoice.com/jacob-selechnik/

a low income downtown New Rochelle zone with substantially lower residential real estate market values, as confirmed by the Referee:

> **MORTGAGED PROPERTY:**
> 153 MORRIS LANE
> NEW ROCHELLE, NY 10801

*See,* Foreclosure Action Surplus Form and Referee Report of Sale (NYSCEF Doc. Nos. 763-764). Copy attached as <u>Exhibit 2</u>.

39.    Defendants LSF9 and Fay, as well as their predecessors WaMu, JPMorgan Chase and Caliber Home Loans Inc., persistently used an incorrect Property address on summonses, pleadings, judgments, foreclosure filings, and Notice of Sale. Such misrepresentations impacted valuation, chilled bidder confidence, and further facilitated bid suppression.

40.    Thus, as a result of the deceptive property address error, the conspirators purchased the auctioned Property at a price lower than would have resulted from a fully competitive auction based on the correct Property address.

41.    **Misstated Payoff Amount:** Between December 2016 and May 2025, Defendant Fay Servicing and its predecessor Caliber Home Loans, acting as servicers for LSF9, transmitted Property payoff statements inflating the lawful redemption amount exceeding on a cumulative basis over $151,000 by May 16, 2025. These figures were knowingly inaccurate and served to obstruct Plaintiffs' right of redemption.

## F. Damage and Injury to Plaintiffs

42.    As a direct consequence of Defendants' wrongful conduct, Plaintiffs have suffered and are suffering irreparable harm and have sustained substantial injury, loss and damage.

43.    Not only is there a chance here that Plaintiffs and their professional and business activities will be irreparably harmed, but injury caused to them as a result of the improper Foreclosure Auction Sale, has already been manifest.

44.     Such examples of harm are as follows: (1) Plaintiffs and their real estate and other ventures have been, and will continue to be deprived of millions of dollars in financing, investor funding and access to capital markets; (2) Plaintiffs' professional and business image, brands and reputations and ability to attract customers and business partners have suffered and will continue to suffer and be greatly impaired, which cannot be easily replaced or restored, and the harm will be irreversible; (3) Plaintiffs' professions and businesses are suffering irreparable harm as a result of interference with their customer and business relationships; (4) the loss of clients, customers, vendors, banking, real estate brokerage, and professional relationships, venture partners, and other economic benefits were negatively impacted and lost; (5) there has been and will continue to be a profound and irreversible impairment and impact on Plaintiffs' and their businesses' goodwill, and their community and social relationships and standing; and (6) the subject and value of the particular harm and damages to Plaintiffs and their businesses and professional occupations is unique, has no established market value, and cannot be easily quantified, but is conservatively estimated to exceed $25 million.

45.     Based on the foregoing, there is significant irreparable harm to Plaintiffs and their businesses and professions, not only possible, but actually occurring as a result of Defendants wrongful conduct.

46.     In sum, Plaintiffs seek actual damages exceeding $25 million; treble damages under Sherman Act, Donnelly Act, FDCPA, and RESPA; statutory penalties and attorneys' fees; and injunctive relief voiding the foreclosure sale and conveyance.

## V. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
(RPAPL § 1503 - Quiet Title Against All Defendants)

47.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the preceding paragraphs and subsequent causes of action with the same force and effect as if fully set forth herein.

48.    Plaintiffs seek declaratory judgment restoring title to the Property due to fraudulent and collusive auction process.

49.    The Mehls have been in possession of the Property for more than the past 25 years, are continuing to be in possession of the Property, and request quiet title herein pursuant to RPAPL § 1503, due to an auction procedure tainted by overreaching, fraud, mistake, collusion, errors, omissions and violation of the **Auction Rules** in connection with the Foreclosure Sale Auction of the subject Property held on May 22, 2025, rendering the sale and conveyance void as more fully set forth herein.

50.    Unless Defendants are enjoined from asserting their adverse claims to the Property, irreparable harm and injury to Plaintiffs with actual damages will continue to ensue in an amount to be proven at trial estimated to be more than $25 million. Plaintiffs have no adequate remedy at law.

51.    No claim is made against any party other than Defendants who claim a legal or equitable right, title, estate, lien or interest in the Property, adverse to Plaintiffs.

52.    Accordingly, Defendants should be barred from all claims to a legal or equitable right, title, estate, lien or interest in the Property, adverse to Plaintiffs, and the foreclosure auction sale and conveyance should be vacated.

53.    Plaintiffs further request that all unknown parties, fictitious defendants, and recorded interests resulting from the foreclosure sale be declared void and expunged from Westchester land records.

## SECOND CAUSE OF ACTION
(Antitrust Violation – Price Fixing, Bid Rigging, and Market Allocation)
(Sherman Act, 15 U.S.C. § 1; Donnelly Act, GBL § 340)
(Against All Defendants)

54.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the preceding paragraphs and subsequent causes of action with the same force and effect as if fully set forth herein.

55.    Between October 2024 and July 2025, or longer, Defendants engaged in contracts, combinations, or a price fixing, bid rigging and market, customer or territorial allocation conspiracy in restraint of trade in the market for foreclosure sale auctions in Westchester County, New York, in violation of the Sherman Act, 15 U.S.C. § 1 and the Donnelly Act, GBL § 340.

56.    Foreclosure Proceedings: In Westchester County, New York, foreclosure proceedings are initiated by the mortgage holder, suing the property owner for defaulting on the mortgage loan and seeking to foreclose on the property that secured the loan. When a judgment is rendered for the mortgage holder, the amount includes, among other things, the remaining balance on the loan secured by the mortgage, interest, and fees.

    a.    Once the mortgage holder obtains a judgment, the judge presiding over the foreclosure proceeding appoints a Referee to conduct a sale of the property by public auction. The Referee is responsible for providing the notice required by New York state law that there would be a foreclosure auction on the date and time specified in the notice.

    b.   Auction.com's Role: Auction.com plays a role in marketing and facilitating the sale of properties once the foreclosure process has been initiated by the lender through the courts.

    c.   Foreclosure Auction: After a judge grants a judgment of foreclosure and sale, the property is scheduled for a public auction, typically held at the county courthouse.

    d.   Lender's Representative: A representative from the lender or their attorney usually attends the auction to protect the lender's interests.

    e.   Winning Bidder: The property is sold to the highest bidder. This could be a third-party buyer or the foreclosing lender if their credit bid is the highest.

**<u>The May 22, 2025 Foreclosure Sale Auction</u>:**

57.    A public foreclosure auction for the sale of the Mehls' Property was held by the Referee at the Westchester County Courthouse, located at 111 Dr. Martin Luther King, Jr. Boulevard, in White Plains, New York, on May 22, 2025 at 2:30 PM.

58.    However, the Referee failed to conspicuously publish or display the Terms of Sale as required under the Auction Rules and did knowingly and willfully coordinate with a representative of Auction.com during the May 22, 2025 foreclosure sale.

59.    On that date, an Auction.com representative (the "Auctioneer") arrived at the designated auction area of the Westchester County Courthouse lobby at about 2:00 PM. He was wearing a baseball cap throughout the auction proceedings. See photograph attached as <u>Exhibit 3</u>.

60.    A woman who turned out to be the winning bidder, Defendant Fahmida Zaman, sat down next to the Auctioneer shortly after 2:00 PM, and they started chatting amicably appearing, upon information and belief, to have known each other from the past. According to her LinkedIn

profile page, Fahmida Zaman is a Real Estate broker specializing in foreclosure sales in Manhattan, The Bronx and Westchester since 2014 to the present.

61.     At about 2:30 PM, the Referee arrived wearing a *Boonie beach hat* and started the auction by reading out the Terms of Sale in a barely audible whisper. The Referee kept wearing the Boonie hat throughout the auction proceedings.

62.     Bidding at the foreclosure auction opened with the Auctioneer standing at the side of the Referee, at an artificially low price of approximately $1.477,264.83, the amount indicated in the Notice of Sale (NYSCEF Doc. No. 719).

63.     This amount was nearly *half a million dollars* below the Mortgage Holder's "upset price" of $1,960,036.12 which had not been previously published or publicly disclosed, thus unfairly catching the other third-party bidders by surprise.

64.     After a few low bids were initially tendered (anonymously) ranging between the opening bid and approximately $1.7 million, the Referee received a signal from the Auction.com representative and announced that the bidding would now start at the $1.96 million Upset Price in minimum $5,000 increments.

65.     The highest sum bid in the amount of **$1,965,000** at the Foreclosure Sale Auction on May 22, 2025, was made (anonymously) by Fahmida Zaman on behalf of TG APTS, consisting of $5,000 above the Upset Price.

66.     Immediately after the auction, the highest bidder, Fahmida Zaman, paid to the Referee by cashier's or certified check a deposit in the amount of $220,000, representing more than 10% of the purchase price, on behalf of the covert co-conspirators and Defendants TG APTS and Jacob Selechnik. The Referee and the highest bidder then completed the Terms of Sale.

67.    The Auctioneer and Fahmida Zaman were seen in front of the Courthouse greeting each other at the end of the auction and coordinating a follow-up call.

68.    The closing on the Property purchased at the public foreclosure auction was held on or about July 1, 2025, at which time the Referee was responsible for distributing the proceeds to the Mortgage Holder in satisfaction of the judgment.

69.    According to Auction.com - Glossary of Terms, the credit bid, also known as "Upset Bid" (or Upset Price) "is the minimum amount bidders must exceed to win the property."

70.    However, the Referee inexplicably sold the mortgaged premises to 153 MLS LLC "for the sum of $1,960,000" on the deceptive grounds of "that being the highest sum bid," further asserting that "153 MLS LLC properly paid the balance of the purchase price ($1,740,000) directly to Fay Servicing, LLC." As a result, no surplus amount remained. *See,* Foreclosure Action Surplus Form and Referee Report of Sale (at ¶¶ 2, 7) filed and entered on July 8, 2025 (NYSCEF Doc. Nos. 763-764). See Ex. 2.

71.    **Premature Conveyance:** On or about July 10, 2025, title was conveyed to 153 MLS LLC (see copy of Deed conveyance attached as Exhibit 4) despite TG APTS having satisfied the full deposit requirement, and without the State Court's *confirmation of sale* as required under RPAPL § 1355. This breach violated both statutory mandates and fiduciary duties owed to the State Court and bidders. This post-auction transfer mechanism evinces coordinated exclusion and market allocation in violation of Federal and State antitrust principles.

72.    **Premature Disposition:** Moreover, on July 10, 2025 the State Court inexplicably marked the case "disposed" sua sponte on the calendar without notice. Thus, the Referee's conveyance without State Court confirmation of sale as required under RPAPL § 1355, and the

sudden sua sponte "disposed" marking without notice, further point to procedural irregularities and compromised impartiality.

**The Conspiracy's Effect on Interstate Commerce:**

73.     Defendants involved in the foreclosure auction included either out-of-state investors, lenders, or brokers or New York investors, lenders, or brokers with out-of-state operations. Consequently, in connection with the property bid, sold or purchased at the public foreclosure auction by the Defendants or their co-conspirators, money and documents moved across state lines as part of those transactions. Those business activities were within the flow of, and substantially affected, interstate trade and commerce.

74.     In or about and between October 2024 and July 2025, both dates being approximate and inclusive, Defendants and others entered into and engaged in a combination and conspiracy that illegally restrained interstate trade and commerce in violation of Section 1 of the Sherman Act, and the Donnelly Act. The combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the Defendants and co-conspirators, the substantial term of which was to suppress competition by refraining from full competitive bidding at a certain public foreclosure auction or auctions held in Westchester County, New York.

75.     It was part of the conspiracy that the Defendants and their co-conspirators agreed not to bid against each other at the public foreclosure auction or auctions at the Westchester County Courthouse. As a result, the conspirators purchased the auctioned Property at a fixed price lower than would have resulted from a fully competitive auction, thereby depriving the property owners of the full value of the auctioned property.

76.     It was further part of the conspiracy that after the public foreclosure auction, the Defendants and their co-conspirators would hold a second, private post-auction transfer, sale or

assignment, open only to the conspirators by which the conspirators would secretly negotiate to acquire the foreclosed property at a fixed price or terms other than the price paid by the conspirators' designated bidder at the public foreclosure auction.

77.    It was further part of the conspiracy that the conspirator who agreed to pay the fixed price could thereafter: (1) proceed to close on the property with the Referee at the price fixed during the rigged, public auction, or (2) sell his right to close on the property at a fixed price set during the rigged post-auction sale or assignment to a third party.

78.    As a direct and proximate result of Defendants' violations, Plaintiffs have sustained actual damages in an amount to be proven at trial estimated to be more than $25 million, and are also entitled to statutory damages, costs, and attorney's fees, including treble damages.

**THIRD CAUSE OF ACTION**
(FDCPA, 15 U.S.C. § 1692 et seq.)
(Against LSF9 and Fay)

79.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the preceding paragraphs and subsequent causes of action with the same force and effect as if fully set forth herein.

80.    Defendants LSF9 and Fay are "debt collectors" within the meaning of the FDCPA, 15 U.S.C. § 1692a(6).

81.    The FDCPA prohibits "debt collectors" from using a "false, deceptive, or misleading representation or means in connection with the collection of any debt," including making false representation of "the character, amount, or legal status of any debt," and using deceptive means "to collect or attempt to collect any debt," 15 U.S.C. § 1692e; engaging in "any conduct the natural consequence of which is lo harass, oppress, or abuse any person," 15 U.S.C. § 1692d; and using "unfair or unconscionable means" to attempt to collect a debt, including

attempting to collect amounts not "expressly authorized by the agreement" creating the debt. 15 U.S.C. § 1692f.

82.     Fay Servicing, a mortgage servicer based in Florida, has been involved in illegal foreclosure actions and foreclosure auctions, having faced sanctions from both the Massachusetts Attorney General and the Consumer Financial Protection Bureau ("CFPB") for its abusive mortgage servicing practices.

83.     On or about August 8, 2022, the Massachusetts Attorney General entered a $3.2 million settlement agreement with Fay who was accused of violations of the Massachusetts Act Preventing Unlawful and Unnecessary Foreclosures, including failing to help homeowners avoid foreclosure, and improper charges of foreclosure-related fees.

84.     On or about August 21, 2024, the CFPB ordered Fay Servicing to pay a $2 million penalty for violations of mortgage servicing laws, as well as for violations of a 2017 agency order that addressed its illegal foreclosure practices. The company failed to implement the order's requirements and continued to break the law.[7]

85.     According to the CFPB, "In 2017, the CFPB took action against Fay Servicing for failing to provide mortgage borrowers with the protections against foreclosure that are required by consumer financial protection law. The CFPB found that the company kept borrowers in the dark about critical information about the process of applying for foreclosure relief. The CFPB also found instances where the servicer illegally launched or moved forward with the foreclosure process when borrowers were actively seeking help to save their homes.

---

[7] See, CFPB - Fay Servicing LLC Consent Order dated August 21, 2024:
https://www.consumerfinance.gov/enforcement/actions/fay-servicing-llc-2024/

The CFPB ordered Fay Servicing to stop its illegal practices and to pay $1.15 million to harmed borrowers."

86.     The CFPB found that "Fay Servicing violated the 2017 order, the Real Estate Settlement Procedures Act, the Truth in Lending Act, the Homeowners Protection Act, and the Consumer Financial Protection Act. Fay Servicing took prohibited foreclosure actions against borrowers seeking mortgage assistance and prevented borrowers from taking advantage of the foreclosure relief options available to them." [8] [9]

87.     Such has been the case here, as Fay and LSF9 engaged in unfair, deceptive, or abusive acts or practices, and launched or moved forward with the foreclosure process when Plaintiffs were actively seeking help to save their home.

88.     Fay harmed Plaintiffs by flouting the CFPB law enforcement order issued in 2017 and violating rules that protect borrowers such as Defendants from prohibited foreclosure activities: The 2017 order required Fay to change its practices, policies, and procedures to ensure it provided mortgage borrowers with protections against prohibited foreclosure activities. However, Fay continued to engage in prohibited foreclosure activities against Plaintiffs.

89.     Defendants LSF9 and Fay acting in concert with the Trustee and/or each other violated the FDCPA, 15 U.S.C. §§ 1692d, l692e, and 1692f by making or causing to be made false and misleading representations, using deceptive means, and engaging in unfair and abusive practices.

---

[8] The Consumer Financial Protection Act (CFPA), also known as Title X of the Dodd-Frank Act, established the CFPB to protect consumers from unfair, deceptive, or abusive practices in the financial services industry.

[9] See, CFPB Takes Action Against Fay Servicing for Illegal Foreclosure Actions and Violating Law Enforcement Order | Consumer Financial Protection Bureau, as retrieved from the CFPB website on 4/1/2025.

90.    Defendants' LSF9 and Fay violations include, but are not limited to the following:

a.    Engaging in abusive bill padding by submitting inflated monthly mortgage statements to the Mehls, for years. For example, a Fay Servicing Mortgage Statement dated May 16, 2025, about a week before the Foreclosure Auction Sale of the Mehls subject Property, stated as follows: "As of 05/16/2025, the Accelerated Amount Due Is $2,111,554.81. This amount will pay off the entire balance of your loan."

b.    **Misstated Payoff Amount:** On or about February 24, 2025, Fay Servicing submitted to the Mehls a Payoff Statement during their Loss Mitigation proceeding in response to their request for a Payoff amount in the context of discussions about a possible redemption or buyout of the mortgage loan. Fay's Payoff Statement included a detailed breakdown of the purported loan account, stating as follows:

*** TOTAL AMOUNT TO PAY LOAN IN FULL *** $2,078,438.34

91.    In contrast to the Fay Payoff Statement in the amount of $2,078,438.34 as of February 24, 2025, and Fay's bill-padded monthly statement showing an "Accelerated Amount Due" of $2,111,554.81 as of May 16, 2025, in the Foreclosure Action Surplus Form and Referee Report of Sale filed and entered on July 8, 2025 (NYSCEF Doc. Nos. 763-764) (see Ex. 2) the Referee reported a much lower Adjusted Judgment Amount (Upset Price) of only $1,960, 036.12 as of the foreclosure auction sale date on May 22, 2025.

92.    This inexplicable discrepancy and Fay's fraudulent misrepresentation of more than $151,500, severely prejudiced and affected the Mehls' ability to redeem the purported mortgage note.

93.     In addition, the Referee's Foreclosure Action Surplus Form clearly laid bare the discrepancy between the Mehls' actual Property address at <u>153 Morris Lane South, Scarsdale, New York, 10583</u>, the Mortgage Holder's fraudulently modified property address in the Judgment of Foreclosure and Sale, and the subject original complaint Mortgaged Property address now shown by the Referee as follows (NYSCEF Doc. No. 763):

>   **MORTGAGED PROPERTY:**
>   153 MORRIS LANE
>   NEW ROCHELLE, NY 10801

*See,* Foreclosure Action Surplus Form and Referee Report of Sale (NYSCEF Doc. Nos. 763-764) Ex. 2.

94.     As a result of the deceptive Property address error, the conspirators purchased the auctioned Property at a price lower than would have resulted from a fully competitive auction based on the correct Property address, thereby depriving the Property owners, the Mehls, of the full value of the auctioned property.

95.     As a direct and proximate result of Defendants' violations, Plaintiffs have sustained actual damages in an amount to be proven at trial estimated to be more than $25 million, and are also entitled to statutory damages, costs, and attorney's fees.

## <u>FOURTH CAUSE OF ACTION</u>
(TILA, 15 USC § 1601 et seq.)
(Against LSF9 and Fay)

96.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the preceding paragraphs and subsequent causes of action with the same force and effect as if fully set forth herein.

97.     Defendants LSF9 and Fay acting in concert with the Trustee and/or each other violated the TILA, 15 USC § 1601 et seq., by making or causing to be made false and misleading

representations, using deceptive means, and engaging in unfair and abusive practices, as set forth above.

98.    Defendants LSF9 and Fay acting in concert with the Trustee and/or each other, and/or their predecessors in interest, violated the TILA-RESPA Integrated Disclosure (TRID) rule, also known as Regulation X (12 CFR Part 1024), requiring disclosures regarding affiliated business arrangements (ABAs) which they failed to provide to Plaintiffs, identifying their relationship, involved parties, and their respective direct or indirect interests or ownership percentages in the Property note and mortgage at issue here, through ownership, partnership, mutual indemnifications, joint representation by counsel, credit-bidding rights, inter-creditor or other agreements.

99.    This has been particularly the case here, as the Property Foreclosure Action was commenced by the Trustee as nominee or alter ego for LSF9, at the contractual request of Fay's predecessor in interest, Caliber Home Loans, creating an implicit, yet undisclosed, affiliate relationship between the mortgage servicers Caliber and Fay, and LSF9, the nominee investor/owner of the Note. See, Attorney's Bailee Letter Agreement (Cert. of Merit, Attorney's Bailee Letter Agreement dated 11-26-2016, NYSCEF Doc. No. 3, at pp. 12-14; NYSCEF Doc. No. 330). Fay has also acted as the Trustee's agent at the Chapter 11 Action.

100.    Moreover, upon information and belief, that may be the case here in connection with undisclosed potential affiliate relationships between Fay, LSF9, and other Defendants or their counsel.

101.    As a direct and proximate result of the Fay and LSF9 Defendants' violations, Plaintiffs have sustained actual damages in an amount to be proven at trial estimated to be more than $25 million, and are also entitled to statutory damages, costs, and attorney's fees.

## FIFTH CAUSE OF ACTION
(RESPA, 12 USC § 2601 et seq.)
(Against LSF9 and Fay)

102.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the preceding paragraphs and subsequent causes of action with the same force and effect as if fully set forth herein.

103.    Defendants LSF9 and Fay acting in concert with the Trustee and/or each other violated the RESPA, 12 USC § 2601 et seq., by making or causing to be made false and misleading representations, using deceptive means, and engaging in unfair and abusive practices, as set forth above.

104.    As a direct and proximate result of Defendants' violations, Plaintiffs have sustained actual damages in an amount to be proven at trial estimated to be more than $25 million, and are also entitled to statutory damages, costs, and attorney's fees, including treble damages.

## SIXTH CAUSE OF ACTION
(GBL § 349)
(Against LSF9 and Fay)

105.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the preceding paragraphs and subsequent causes of action with the same force and effect as if fully set forth herein.

106.    Defendants LSF9 and Fay acting in concert with the Trustee and/or each other violated the General Business Law § 349, by engaging in consumer-oriented conduct that was materially misleading, by making or causing to be made false and misleading representations, using deceptive means, and engaging in unfair and abusive practices, as set forth above.

107.    As a direct and proximate result of Defendants' violations, Plaintiffs have sustained actual damages in an amount to be proven at trial estimated to be more than $25 million, and are also entitled to statutory damages, costs, and attorney's fees.

**SEVENTH CAUSE OF ACTION**
Declaratory Judgment (28 U.S.C. § 2201)

108.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

109.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek judicial determination and a declaratory judgment voiding the foreclosure auction and resulting conveyance, restoring title to the Property due to fraudulent and collusive auction process.

110.    Plaintiffs further seek judicial declaration that the foreclosure auction and resulting conveyance were void ab initio due to material fraud, collusion, and procedural irregularities.

111.    In light of the procedural irregularities, premature conveyance, and unresolved judicial confirmation under RPAPL § 1355, Plaintiffs believe that additional conveyances or encumbrances may be attempted by Defendants or co-conspirators. Such conduct would materially harm Plaintiffs' legal and equitable rights, obstruct the Court's ability to render complete relief, and risk irreparable injury to Plaintiffs' title and possession. Therefore, injunctive relief preserving the status quo is necessary.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that this Court enter judgment jointly and severally as against each of the Defendants, known or unknown, as follows:

A.  Ordering that it be declared and adjudged that Defendants have no estate, right, title, or interest whatsoever in or to the Property or any part of it;

B.  Ordering that it be declared and adjudged that the foreclosure auction sale held on May 22, 2025 and subsequent conveyance dated July 10, 2025 be declared void and be vacated;

C.  Ordering that Defendants be temporarily and permanently enjoined and restrained from asserting any estate, right, title, or interest whatsoever, in or to the Property or any part of it, adverse to Plaintiffs;

D.  Ordering that it be declared and adjudged that Plaintiffs are the sole rightful owners of the Property;

E.  Ordering that Defendants be temporarily and permanently enjoined from transferring, encumbering, assigning, or otherwise altering the ownership status of the Property until the Court has adjudicated the merits of this Complaint, in order to preserve the status quo and prevent further clouding of title or irreparable injury to Plaintiffs;

F.  Ordering provisional injunctive relief consistent with Federal Rule of Civil Procedure 65, prohibiting any disposition of the subject Property pending resolution of the present claims for quiet title, declaratory judgment, and damages;

G.  Awarding Plaintiffs actual and compensatory damages, offsets, refunds, costs, and disbursements in an amount to be proven at trial estimated to be over $25 million, and including treble damages; and

H.  Awarding such other and further relief, including equitable remedies, as the Court may deem just and proper.

Dated: July 28, 2025
Scarsdale, New York

By:  _____
    Norbert Mehl
    _____

Batsheva Mehl
153 Morris Lane South
Scarsdale, NY 10583
Telephone: 914-960-9579
norbert.mehl@gmail.com
*Plaintiffs Pro Se*